**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| ROBERT BERG, Individually and On Behalf of All Others Similarly Situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>COVISINT CORPORATION, JOHN F. SMITH, BERNARD M. GOLDSMITH, WILLIAM O. GRABE, DAVE HANSEN, SAM INMAN III, ANDREAS MAI, JONATHAN YARON, OPEN TEXT CORPORATION, and CYPRESS MERGER SUB, INC., )<br>)<br>Defendants. ) | Case No. _____<br><br>JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This action stems from a proposed transaction announced on June 5, 2017 (the "Proposed Transaction"), pursuant to which Covisint Corporation ("Covisint" or the "Company") will be acquired by Open Text Corporation ("Parent") and Cypress Merger Sub, Inc. ("Merger Sub" and together with Parent, "Open Text").

2. On June 5, 2017, Covisint's Board of Directors (the "Board" or "Individual Defendants") caused the Company to enter into an agreement and plan of merger (the "Merger Agreement") with Open Text. Pursuant to the terms of the Merger Agreement, shareholders of Covisint will receive $2.45 in cash for each share of Covisint common stock.

3.     On June 15, 2017, defendants filed a Preliminary Proxy Statement (the "Proxy Statement") with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction.

4.     The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.  Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy Statement.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over the claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

6.     This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

8.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Covisint common stock.

9.     Defendant Covisint is a Michigan corporation and maintains its principal executive offices at 26533 Evergreen Road, Suite 500, Southfield, Michigan 48076.  Covisint's common stock is traded on the NasdaqGS under the ticker symbol "COVS."

10. Defendant John F. Smith ("Smith") has served as a director of Covisint since August 2016 and is Chairman of the Board. According to the Company's website, Smith is Chair of the Nominating and Governance Committee.

11. Defendant Bernard M. Goldsmith ("Goldsmith") has served as a director of Covisint since November 2012. According to the Company's website, Goldsmith is Chair of the Audit Committee and a member of the Compensation Committee.

12. Defendant William O. Grabe ("Grabe") is a director of Covisint. According to the Company's website, Grabe is a member of the Nominating and Governance Committee and the Compensation Committee.

13. Defendant Dave Hansen ("Hansen") is a director of Covisint. According to the Company's website, Hansen is Chair of the Compensation Committee and a member of the Audit Committee.

14. Defendant Sam Inman III ("Inman") is a director and Chief Executive Officer ("CEO") of Covisint.

15. Defendant Andreas Mai ("Mai") has served as a director of Covisint since August 2016. According to the Company's website, Mai is a member of the Nominating and Governance Committee.

16. Defendant Jonathan Yaron ("Yaron") has served as a director of Covisint since August 2016. According to the Company's website, Yaron is a member of the Audit Committee.

17. The defendants identified in paragraphs 10 through 16 are collectively referred to herein as the "Individual Defendants."

18. Defendant Parent is a Canadian corporation and a party to the Merger Agreement.

19. Defendant Merger Sub is a Michigan corporation, a wholly-owned subsidiary of

3

Parent, and a party to the Merger Agreement.

## CLASS ACTION ALLEGATIONS

20.  Plaintiff brings this action as a class action on behalf of himself and the other public stockholders of Covisint (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

21.  This action is properly maintainable as a class action.

22.  The Class is so numerous that joinder of all members is impracticable.  As of June 5, 2017, there were approximately 40,865,897 shares of Covisint common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

23.  Questions of law and fact are common to the Class, including, among others, whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

24.  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

25.  The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

26. Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

*Background of the Company and the Proposed Transaction*

27. Covisint provides an open, developer-friendly, enterprise-class cloud platform to facilitate the rapid development and deployment of Internet of Things ("IoT"), Identity Management ("IdM"), and B2B collaboration solutions.

28. The Company's platform enables users to securely identify, authenticate, and connect users, devices, applications, and information, and has been successfully operating globally at enterprise scale for over twelve years.

29. Today, the Covisint platform enables more than 3,000 organizations to connect with more than 212,000 business partners and customers, and supports more than $4 billion in ecommerce transactions annually.

30. On June 5, 2017, Covisint issued a press release wherein it announced its fourth quarter and full-year fiscal 2017 financial results. Among other things, for the fourth quarter, GAAP net income was $1.6 million, or $0.04 per diluted share, compared to net loss of $0.1 million, or ($0.00) per share, in the same period last year. Non-GAAP net income was $2.6 million, or $0.06 per diluted share, compared to net loss of $0.5 million, or ($0.01) per share, in the same period last year. During the quarter, the Company hosted customers and showcased the Covisint IoT Platform at the 2017 Consumer Electronics Show in Las Vegas, NV, and announced that the Company was recognized as "Supplier of the Year" for the second consecutive year by SAIC General Motors. Additionally, the Company launched the most

5

complete IoT Platform for enabling digital transformation, unlocking the full business value of enterprise IoT solutions by securely connecting complete ecosystems of people, systems, and things.

31.     Nevertheless, the Board caused the Company to enter into the Merger Agreement, pursuant to which Covisint will be acquired for inadequate consideration.

32.     The Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "no solicitation" provision in the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals. Section 5.3(a) of the Merger Agreement states:

> (a) Subject to Section 5.3(b) and the remainder of this Section 5.3, from the Agreement Date until the earlier of the Effective Time and the date on which this Agreement is terminated pursuant to Section 7.1, the Company shall not, nor shall it authorize or permit any of its Subsidiaries or authorize or direct any of its or their respective Representatives to, directly or indirectly: (i) solicit, initiate or knowingly encourage or knowingly facilitate the making, submission or announcement of an Acquisition Proposal; (ii) other than informing Persons of the provisions contained in this Section 5.3, enter into, continue or participate in any discussions or any negotiations regarding any Acquisition Proposal or furnish to any Person any non-public information in connection with or for the purpose of knowingly encouraging or knowingly facilitating any Acquisition Proposal; (iii) enter into any letter of intent, acquisition agreement or other agreement (other than an Acceptable Confidentiality Agreement) with respect to any Acquisition Proposal or with respect to any proposal, offer or inquiry that would reasonably be expected to lead to an Acquisition Proposal; or (iv) resolve or agree to do any of the foregoing. The Company shall, and shall cause each of its Subsidiaries or its or their respective directors and officers to, and shall direct its and their other Representatives to, (A) immediately cease and cause to be terminated all discussions or negotiations with any Person (other than Parent and its Representatives) previously conducted with respect to any Acquisition Proposal, (B) terminate access by any third party (other than Parent and its Representatives) to any due diligence or electronic or physical data room with respect to any Acquisition Transaction, (C) request the prompt return or destruction of any confidential or proprietary information provided to any third party (other than Parent and its Representatives) in connection with an Acquisition Proposal during the preceding twelve (12) months and (D) enforce the provisions of any existing confidentiality or non-disclosure agreement entered into in connection with an Acquisition Transaction; *provided*, that nothing in this Section 5.3 shall prohibit

the Company from granting waivers of any standstill provision to the extent that such provision would otherwise prohibit the counterparty thereto from making a confidential Acquisition Proposal directly to the Company Board in accordance with the terms of this Section 5.3. Any act or omission by a Representative of the Company or its Subsidiaries that would, if taken by the Company, constitute a violation of this Section 5.3, shall constitute a violation of this Section 5.3 by the Company.

33. Further, the Company must promptly advise Open Text of any proposals or inquiries received from other parties. Section 5.3(f) of the Merger Agreement states:

(f) The Company shall promptly (and in any event within twenty-four (24) hours) advise Parent orally and in writing in the event that the Company or its Representatives receive any offers, proposals or inquiries relating to any Acquisition Proposal or any non-public information with respect to any Acquisition Proposal that is requested from the Company and its Representatives, and in connection with such notice, if applicable, provide to Parent the material terms and conditions (including the identity of the third party making any such Acquisition Proposal) of any such Acquisition Proposal. The Company shall (i) promptly notify Parent if the Company or such third party has decided to not pursue such Acquisition Proposal and (ii) provide to Parent as soon as practicable (and in any event within twenty-four (24) hours) after receipt or delivery thereof any written indication of interest (or amendment thereto) or any written material that constitutes an offer (or amendment thereto) including copies of any proposed Company Acquisition Agreements and any financing commitments related thereto. The Company shall keep Parent reasonably informed as promptly as practicable of any material developments affecting the terms and conditions of any such Acquisition Proposals. Without limiting the foregoing, the Company shall promptly (and in any event within twenty-four (24) hours) advise Parent in writing if the Company Board determines to begin providing information or engaging in discussions or negotiations concerning an Acquisition Proposal pursuant to Section 5.3(b).

34. Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Open Text a "matching right" with respect to any "Superior Proposal" made to the Company. Section 5.3(e) of the Merger Agreement provides:

(e) Notwithstanding anything to the contrary set forth in Section 5.3(c) or any other provision contained in this Agreement:

(i) if the Company has received a Superior Proposal, the Company Board (or a

7

duly authorized committee thereof) may terminate this Agreement pursuant to Section 7.1(d)(ii) to accept such Superior Proposal, but only if (1) the Company provides Parent prior written notice of its intent to terminate this Agreement pursuant to Section 7.1(d)(ii) at least four (4) Business Days prior to taking such action (a "Superior Proposal Notice") and specifying in reasonable detail the reasons for such actions, the material terms and conditions of such Superior Proposal and, if available, including in the Superior Proposal Notice a copy of the relevant proposed transaction agreement (it being understood that such Superior Proposal Notice shall not in itself be deemed a notice to terminate this Agreement, subject to the Company's compliance otherwise with this Section 5.3); (2) during such four (4) Business Day period following Parent's receipt of the Superior Proposal Notice, the Company shall, and shall cause its financial and legal advisors and other Representatives to, negotiate in good faith with Parent (if Parent desires to so negotiate) to make such adjustments in the terms and conditions of this Agreement that Parent proposes to make as would obviate such Superior Proposal constituting a Superior Proposal (and therefore constituting the basis for the termination of this Agreement pursuant to Section 7.1(d)(ii)); and (3) at the end of such four (4) Business Day period and taking into account any modifications to the terms of this Agreement proposed by Parent to the Company in a written, binding and irrevocable offer, the Company Board (or a duly authorized committee thereof) determines in good faith (after consultation with financial advisors and outside legal counsel) that such Superior Proposal, taking into account any adjustments proposed by Parent pursuant to the preceding clause (2) of this Section 5.3(e)(i), still constitutes a Superior Proposal and therefore that the failure to terminate this Agreement pursuant to Section 7.1(d)(ii) would be inconsistent with its fiduciary duties under applicable Law[.] . . .

For purposes of clauses (i) and (ii) of this Section 5.3(e), if Parent, within four (4) Business Days following its receipt of a Superior Proposal Notice or an Adverse Recommendation Change Notice, makes an offer that, as determined in good faith by the Company Board (after consultation with its financial advisors and outside legal counsel) results in the applicable Acquisition Proposal no longer being a Superior Proposal or the Intervening Event not otherwise constituting a basis for an Adverse Recommendation Change, then the Company shall have no right to terminate this Agreement pursuant to Section 7.1(d)(ii) as a result of such Acquisition Proposal or Intervening Event. Any (1) material revisions to the terms of a Superior Proposal or (2) material revisions to an Acquisition Proposal that the Company Board had determined no longer constitutes a Superior Proposal shall constitute a new Acquisition Proposal and shall in each case require the Company to deliver to Parent a new Superior Proposal Notice; provided, however, that the four (4) Business Day periods in this Section 5.3(e) otherwise applicable to such revised Superior Proposal shall thereafter instead be two (2) Business Day periods.

35.     Further locking up control of the Company in favor of Open Text, the Merger

Agreement provides for a "termination fee" of $3,850,000, payable by the Company to Open Text if the Individual Defendants cause the Company to terminate the Merger Agreement.

36. By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

37. Additionally, certain of the executive officers and each director of the Company entered into voting agreements, pursuant to which they have agreed to vote their Company shares in favor of the Proposed Transaction. Accordingly, such shares are already locked up in favor of the merger.

38. The consideration to be provided to plaintiff and the Class in the Proposed Transaction is inadequate.

39. Among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction.

40. Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

*The Proxy Statement Omits Material Information, Rendering It False and Misleading*

41. Defendants filed the Proxy Statement with the SEC in connection with the Proposed Transaction.

42. The Proxy Statement omits material information with respect to the Proposed Transaction, which renders the Proxy Statement false and misleading.

43. First, the Proxy Statement omits material information regarding Covisint's financial projections and the financial analyses performed by the Company's financial advisor,

9

Evercore Group L.L.C. ("Evercore"), in support of its so-called fairness opinion.

44. For example, with respect to Evercore's financial projections, the Proxy Statement fails to disclose: (i) unlevered free cash flow and its constituent line items; (ii) net income; (iii) capital expenditures; (iv) increases in net working capital; (v) net earnings; (vi) earnings per share; (vii) interest expense; (viii) taxes; (ix) depreciation and amortization; (x) total operating costs and expenses; (xi) "other cash expenses"; (xii) stock-based compensation; and (xiii) a reconciliation of all non-GAAP to GAAP metrics for all years of projections.

45. With respect to Evercore's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) unlevered, after-tax free cash flows that the Company was estimated generate during the period from April 1, 2017 through March 31, 2021 and the constituent line items; (ii) the estimated terminal value of the Company; (iii) the inputs and assumptions underlying the discount rate range of 13.0% to 15.0%; and (iv) Evercore's bases for applying implied perpetuity growth rates of 2.0% to 5.0% and -5.0% to -3.0%.

46. With respect to Evercore's *Peer Group Trading Multiples Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies observed by Evercore in the analysis.

47. With respect to Evercore's *Precedent Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Evercore in the analysis.

48. With respect to Evercore's *Premiums Paid Analysis*, the Proxy Statement fails to disclose: (i) the U.S. target companies observed by Evercore; and (ii) the premiums paid in the transactions.

49. The disclosure of projected financial information is material because it provides

stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. Moreover, when a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed.

50. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; (iii) "Recommendation of the Company's Board of Directors"; (iv) "Certain Financial Projections"; and (v) "Opinion of Evercore Group L.L.C., Financial Advisor to the Company."

51. Second, the Proxy Statement fails to disclose whether any non-disclosure agreements executed by Covisint and the prospective bidders contained standstill and/or "don't ask, don't waive" provisions that are or were preventing those counterparties from submitting superior offers to acquire the Company.

52. Without this information, stockholders may have the mistaken belief that, if these potentially interested parties wished to come forward with a superior offer, they are or were permitted to do so, when in fact they are or were contractually prohibited from doing so.

53. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; and (iii) "Recommendation of the Company's Board of Directors."

54. Third, the Proxy Statement omits material information regarding potential

11

conflicts of interest of the Company's officers and directors.

55. Specifically, the Proxy Statement fails to disclose the timing and nature of all communications regarding future employment and/or directorship of Covisint's officers and directors, including who participated in all such communications.

56. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

57. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; (iii) "Recommendation of the Company's Board of Directors"; and (iv) "Interests of the Company's Directors and Executive Officers in the Merger."

58. Fourth, the Proxy Statement omits material information regarding potential conflicts of interest of Evercore.

59. For example, the Proxy Statement fails to disclose whether Evercore has performed services for Covisint or its affiliates in the past two years, as well as the amount of compensation received for such services.

60. Additionally, the Proxy Statement fails to disclose Evercore's holdings in Covisint's, Open Text's, and their affiliates' stock.

61. Full disclosure of investment banker compensation and all potential conflicts is required due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives.

62. The omission of this material information renders the Proxy Statement false and misleading, including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; (ii) "Reasons for the Merger"; (iii) "Recommendation of the Company's Board of Directors"; and (iv) "Opinion of Evercore Group L.L.C., Financial Advisor to the Company."

63. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to Covisint's stockholders.

## COUNT I

**Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants and Covisint**

64. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

65. The Individual Defendants disseminated the false and misleading Proxy Statement, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading. Covisint is liable as the issuer of these statements.

66. The Proxy Statement was prepared, reviewed, and/or disseminated by the Individual Defendants. By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy Statement.

67. The Individual Defendants were at least negligent in filing the Proxy Statement with these materially false and misleading statements.

68. The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder will consider them important in deciding how to vote on the Proposed Transaction. In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy Statement and in other information reasonably available to stockholders.

69. The Proxy Statement is an essential link in causing plaintiff and the Company's stockholders to approve the Proposed Transaction.

70. By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

71. Because of the false and misleading statements in the Proxy Statement, plaintiff and the Class are threatened with irreparable harm.

## COUNT II

### Claim for Violation of Section 20(a) of the 1934 Act
### Against the Individual Defendants and Open Text

72. Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

73. The Individual Defendants and Open Text acted as controlling persons of Covisint within the meaning of Section 20(a) of the 1934 Act as alleged herein. By virtue of their positions as officers and/or directors of Covisint and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

74. Each of the Individual Defendants and Open Text was provided with or had unlimited access to copies of the Proxy Statement alleged by plaintiff to be misleading prior to

14

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

75. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same. The Proxy Statement contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. They were thus directly in the making of the Proxy Statement.

76. Open Text also had direct supervisory control over the composition of the Proxy Statement and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy Statement.

77. By virtue of the foregoing, the Individual Defendants and Open Text violated Section 20(a) of the 1934 Act.

78. As set forth above, the Individual Defendants and Open Text had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act. As a direct and proximate result of defendants' conduct, plaintiff and the Class are threatened with irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.	In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C.	Directing the Individual Defendants to disseminate a Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

D.	Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

E.	Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

F.	Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: June 21, 2017	**ANTHONY L. DELUCA, PLC**

By:	*/s/ Anthony L. DeLuca*
Anthony L. DeLuca (P64874)
Grand Marais Professional Centre
14950 East Jefferson Avenue, Suite 170
Grosse Pointe Park, MI 48230
Telephone: (313) 821-5905
Facsimile: (313) 821-5906

*Attorneys for Plaintiff*

**OF COUNSEL:**

**RIGRODSKY & LONG, P.A.**
Brian D. Long
Gina M. Serra
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

16

**RM LAW, P.C.**
Richard A. Maniskas
1055 Westlakes Drive, Suite 3112
Berwyn, PA 19312
(484) 324-6800